## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____ **14 - 20324 CR-MOORE**

/ McALILEY

18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(A)(1)(B)(i)
18 U.S.C. § 2
18 U.S.C. § 982

**UNITED STATES OF AMERICA**

**vs.**

**IGOR ITURRIAGA,**
**OVIDIO ITURRIAGA, and**
**ESTHER LOPEZ,**

                **Defendants.**

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### The Medicare Program

1.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound.  Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

### Medicare Billing and Payment Procedures

4.      Physicians, clinics, and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

5.      CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A

2

program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims.  As administrator, Palmetto was to receive, adjudicate, and pay, claims submitted by HHA providers under the Part A program for home health claims.

## Part A Coverage and Regulations

## Reimbursements

6.     The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

a.     the patient was confined to the home, also referred to as homebound;

b.     the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

c.     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical and occupational therapy ("PT/OT"), or speech therapy, and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.     HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for

3

each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.      In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60 day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" are additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9.      Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through

4

Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary.  The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition.  The home health nurse, therapist, and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.  These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## Special Outlier Provision

12.     Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency. That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.

13.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries that had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

## The Defendants, Their Companies, and Related Entities

14.     PTOT Pro, Inc. ("PTOT") was a Florida corporation, incorporated on or about September 7, 2010, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

15.     SASI Consulting Corp. ("SASI") was a Florida corporation, incorporated on or about March 22, 2011, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

16.     Simalex Group Co. ("Simalex") was a Florida corporation, incorporated on or about August 16, 2011, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

17.     Vicum Consulting Group Corp. ("Vicum") was a Florida corporation, incorporated on or about October 17, 2012, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

18.     E.L. Marketing was a Florida corporation, incorporated on or about June 9, 2007, with its principal place of business in Miami-Dade County, in the Southern District of Florida.

19.     Miami United Home Health Care, Inc. ("Miami United") was a Florida corporation, incorporated on or about January 8, 2009, with is principal place of business in Miami-Dade County, in the Southern District of Florida, purportedly providing services to homebound Medicare beneficiaries.

20.     TGR Home Health Care, Inc. ("TGR") was a Florida corporation, incorporated on or about June 27, 2006, with is principal place of business in Miami-Dade County, in the Southern District of Florida, purportedly providing services to homebound Medicare beneficiaries.

21.     Defendant **IGOR ITURRIAGA**, a resident of Miami-Dade County, was the president and registered agent of PTOT and the president of Simalex.

22.     Defendant **OVIDIO ITURRIAGA**, a resident of Miami-Dade County, was the registered agent of Simalex.

23.     **IGOR ITURRIAGA** and **OVIDIO ITURRIAGA** controlled Citibank account number xxxxxx5612 opened on behalf of PTOT, JP Morgan Chase Bank account number

7

xxxxxx7104 opened on behalf of Simalex, and JP Morgan Chase Bank account number xxxxxx8780 opened on behalf of Vicum. **OVIDIO ITURRIAGA** controlled TD Bank account xxxxxx1031 opened on behalf of SASI.

24.    Defendant **ESTHER LOPEZ**, a resident of Miami-Dade County, was the president and registered agent of E.L. Marketing and controlled Wachovia Bank corporate account number xxxxxxxxx4668 opened on behalf of E.L. Marketing.

25.    Raidel La O Ramos, a resident of Miami-Dade County, was an owner of both Miami United and TGR and was an operator of both entities.

26.    Alfredo Baryolo Cardoso, a resident of Miami-Dade County, was the president, secretary, director, registered agent, and administrator of Miami United.  Cardoso was an owner of both Miami United and TGR and was an operator of both entities.

27.    Miguel Angel Perez, a resident of Miami-Dade County, was an owner of both Miami United and TGR and was an operator of both entities.

### COUNT 1
### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.    Paragraphs 1 through 27 of the General Allegations section of this Indictment are realleged and incorporated as if fully set forth herein.

2.    Beginning in or around October 2012, and continuing through in or around December 2012, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**IGOR ITURRIAGA,**
**OVIDIO ITURRIAGA,**
**and**

Medicare for home health services that Miami United and TGR purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.      **IGOR ITURRIAGA, OVIDIO ITURRIAGA**, and **ESTHER LOPEZ** cashed checks for their co-conspirators, including Raidel La O Ramos, Alfredo Baryolo Cardoso, and Miguel Angel Perez, knowing that the cash they provided to their co-conspirators would be used to pay kickbacks to patient recruiters who provided Medicare beneficiaries to Miami United and TGR.

5.      **IGOR ITURRIAGA, OVIDIO ITURRIAGA**, and **ESTHER LOPEZ** accepted kickbacks from co-conspirators Raidel La O Ramos, Alfredo Baryolo Cardoso, and Miguel Angel Perez in return for referring Medicare beneficiaries to Miami United and TGR for home health services.

6.      **IGOR ITURRIAGA, OVIDIO ITURRIAGA, ESTHER LOPEZ**, and their co-conspirators caused Miami United and TGR to submit claims to Medicare for home health services purportedly provided to the recruited Medicare beneficiaries.

7.      **IGOR ITURRIAGA, OVIDIO ITURRIAGA, ESTHER LOPEZ**, and their co-conspirators caused Medicare to pay Miami United and TGR based upon the home health services purportedly provided to the recruited Medicare beneficiaries.

**ESTHER LOPEZ,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other,  Raidel La O Ramos, Alfredo Baryolo Cardoso, Miguel Angel Perez, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

     a.     to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and

     b.     to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including  kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

     3.     It was the purpose of the conspiracy for the defendants and their co-conspirators to unjustly enrich themselves by, among other things: (1) offering, paying, soliciting, and receiving kickbacks and bribes in return for referring Medicare beneficiaries to Miami United and TGR to serve as patients; and (2) submitting and causing the submission of claims to

9

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about October 31, 2012, **ESTHER LOPEZ** received Miami United check number 1175 in the amount of $3,400, made payable to E.L. Marketing, in return for referring patients to Miami United.

2.      On or about November 7, 2012, **ESTHER LOPEZ** received Miami United check number 1209 in the amount of $1,700, made payable to E.L. Marketing, in return for referring patients to Miami United.

3.      On or about November 28, 2012, **IGOR ITURRIAGA** and **OVIDIO ITURRIAGA** deposited and caused to be deposited TGR check number 1009 in the amount of $7,569 into Simalex Group Co. JP Morgan Chase Bank account number xxxxxxxx7104.

4.      On or about December 20, 2012, **IGOR ITURRIAGA** and **OVIDIO ITURRIAGA** deposited and caused to be deposited Miami United check number 1467 in the amount of $7,350 into PTOT Pro, Inc. Citibank account number xxxxxxxxx5612.

5.      On or about December 21, 2012, **ESTHER LOPEZ** received Miami United check number 1037 in the amount of $1,700, made payable to E.L. Marketing, in return for referring patients to Miami United.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-4
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.      Paragraphs 1 through 27 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates enumerated below as to each count, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

### ESTHER LOPEZ,

did knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by checks, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, that is, home health services, for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, as set forth below:

| Count | Approximate Date | Approximate Kickback Amount |
|-------|------------------|------------------------------|
| 2 | 10/31/2012 | $3,400 |
| 3 | 11/7/2012 | $1,700 |
| 4 | 12/21/2012 | $1,700 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), and Title 18, United States Code, Section 2.

## COUNT 5
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.      Paragraphs 1 through 27 of the General Allegations section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.      Beginning in or around October 2012, and continuing through in or around December 2012, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**IGOR ITURRIAGA,**
**OVIDIO ITURRIAGA,**
**and**
**ESTHER LOPEZ,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, with Raidel La O Ramos, Alfredo Baryolo Cardoso, Miguel Angel Perez, and with others known and unknown to the Grand Jury, to knowingly conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

It is further alleged that the specified unlawful activity is health care fraud, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1956(h).

13

**COUNTS 6-16**
**Money Laundering**
**(18 U.S.C. § 1956(a)(1)(B)(i))**

1.      Paragraphs 1 through 27 of the General Allegations section of this Indictment are

realleged and incorporated by reference as if fully set forth herein.

2.      On or about the date specified as to each count below, in Miami-Dade County, in

the Southern District of Florida, and elsewhere, the defendants,

**IGOR ITURRIAGA,**
**OVIDIO ITURRIAGA,**
**and**
**ESTHER LOPEZ,**

as specified in each count below, did knowingly conduct and attempt to conduct a financial

transaction affecting interstate commerce, which transaction involved the proceeds of specified

unlawful activity, knowing that the property involved in the financial transaction represented the

proceeds of some form of unlawful activity, and knowing that the transaction was designed in

whole and in part to conceal and disguise the nature, the location, the source, the ownership, and

the control of the proceeds of specified unlawful activity, as set forth below:

| Count | Defendant(s) | Approximate Date of Transaction | Description of Financial Transaction |
|-------|--------------|--------------------------------|--------------------------------------|
| 6 | **ESTHER LOPEZ** | 10/10/2012 | The deposit of approximately $5,100 into Wachovia Bank account number xxxxxxxxx4668 via check no. 1108, drawn on the account of Miami United Home Health Care, Inc. and made payable to **E.L. Marketing** |

14

| Count | Defendant(s) | Approximate Date of Transaction | Description of Financial Transaction |
|---|---|---|---|
| 7 | **ESTHER LOPEZ** | 10/10/2012 | The deposit of approximately $5,100 into Wachovia Bank account number xxxxxxxxx4668 via check no. 1154, drawn on the account of Miami United Home Health Care, Inc. and made payable to **E.L. Marketing** |
| 8 | **IGOR ITURRIAGA and OVIDIO ITURRIAGA** | 11/28/2012 | The deposit of approximately $6,969 into TD Bank account number xxxxxx1031 via check no. 1008, drawn on the account of TGR Home Health Care, Inc. and made payable to **SASI Consulting, Corp.** |
| 9 | **IGOR ITURRIAGA and OVIDIO ITURRIAGA** | 11/28/2012 | The deposit of approximately $7,569 into JP Morgan Chase Bank account number xxxxxx7104 via check no. 1009, drawn on the account of TGR Home Health Care, Inc. and made payable to **Simalex Group, Co.** |
| 10 | **IGOR ITURRIAGA and OVIDIO ITURRIAGA** | 12/13/2012 | The deposit of approximately $6,800 into Citibank account number xxxxxx5612 via check no. 1022, drawn on the account of TGR Home Health Care, Inc. and made payable to **PTOT Pro, Inc.** |

| Count | Defendant(s) | Approximate Date of Transaction | Description of Financial Transaction |
|---|---|---|---|
| 11 | **IGOR ITURRIAGA and OVIDIO ITURRIAGA** | 12/18/2012 | The deposit of approximately $4,744 into JP Morgan Chase Bank account number xxxxxx8780 via Check No. 1035, drawn on the account of TGR Home Health Care, Inc. and made payable to **Vicum Consulting Group, Corp.** |
| 12 | **IGOR ITURRIAGA and OVIDIO ITURRIAGA** | 12/18/2012 | The deposit of approximately $4,635 into JP Morgan Chase Bank account number xxxxxx8780 via Check No. 1468, drawn on the account of Miami United Home Health Care, Inc. and made payable to **Vicum Consulting Group, Corp.** |
| 13 | **ESTHER LOPEZ** | 12/18/2012 | The deposit of approximately $7,000 into Wachovia Bank account number xxxxxxxxx4668 via check no. 1556, drawn on the account of TGR Home Health Care, Inc. and made payable to **E.L. Marketing** |

| Count | Defendant(s) | Approximate Date of Transaction | Description of Financial Transaction |
|---|---|---|---|
| 14 | **IGOR ITURRIAGA** and **OVIDIO ITURRIAGA** | 12/20/2012 | The deposit of approximately $7,350 into Citibank account number xxxxxx5612 via check no. 1467, drawn on the account of Miami United Home Health Care, Inc. and made payable to **PTOT Pro, Inc.** |
| 15 | **ESTHER LOPEZ** | 12/27/2012 | The deposit of approximately $5,515 into Wachovia Bank account number xxxxxxxxx4668 via check no. 1561, drawn on the account of TGR Home Health Care, Inc. and made payable to **E.L. Marketing** |
| 16 | **ESTHER LOPEZ** | 12/27/2012 | The deposit of approximately $4,885 into Wachovia Bank account number xxxxxxxxx4668 via check no. 1043, drawn on the account of TGR Home Health Care, Inc. and made payable to **E.L. Marketing** |

It is further alleged that the specified unlawful activity is health care fraud, in violation of Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

**FORFEITURE**
**(18 U.S.C. § 982)**

1.     The allegations contained in Counts 1 through 16 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants, **IGOR ITURRIAGA, OVIDIO ITURRIAGA,** and **ESTHER LOPEZ,** have an interest.

2.     Upon conviction of any violation of Title 42, United States Code, Section 1320a-7b(b), or any conspiracy to commit such violations, as alleged in this Indictment, each defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense pursuant to Title 18, United States Code, Section 982(a)(7).

3.     Upon conviction of a violation of, or a conspiracy to violate, Title 18, United States Code, Section 1956, as alleged in this Indictment, each defendant so convicted shall forfeit to the United States all of his or her right, title and interest in any property, real or personal, involved in such violation, or in any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.     If any property described as being subject to forfeiture in paragraphs 2 and 3, above, as a result of any act or omission of any defendant,

       (a)     cannot be located upon the exercise of due diligence;

       (b)     has been transferred or sold to or deposited with a third party;

       (c)     has been placed beyond the jurisdiction of the Court;

       (d)     has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States to seek forfeiture of any other property of any of the defendants up to the value of the above forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

4.    The property subject to forfeiture as substitute property, pursuant to Title 21, United States Code, Section 853(p), includes, but is not limited to, the following:

Real property known and numbered as 10885 SW 153rd Avenue, Miami, Florida 33196, together with all appurtenances, improvements and attachments thereon;

Real property known and numbered as 13830 SW 152nd Place, Miami, Florida 33196, together with all appurtenances, improvements and attachments thereon;

A 2014 Infinity Q50 automobile, Florida license plate number 486TBZ, Vehicle Identification Number JN1Bxxxxxxxxx9860;

A 2011 Infinity EX35 automobile, Florida license plate number ATMA69, Vehicle Identification Number JN1Axxxxxxxxx0396;

A 2006 BMW 530i automobile, Florida license plate number 187XKC, Vehicle Identification Number WBANxxxxxxxxx2033; and

A 1966 Lincoln automobile, Florida license plate number 05EAM, Vehicle Identification Number 6Y86xxx3513.

5.    The United States will seek a forfeiture money judgment against the defendants, jointly and severally, as part of any sentence in the following amount:

$6,500,000 in United States currency, which is a sum of money equal in value to the property, real or personal, involved in the violations alleged in this Indictment, and the property traceable to such property.

All pursuant to Title 18, United States Code, Section 982(a)(1) and the procedures set forth at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____
FOREPERSON

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
ROBERT T. WATSON
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

IGOR ITURRIAGA, et al.

                    Defendants.
_____/

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

| | | |
|---|---|---|
| New Defendant(s) | Yes _____ | No _____ |
| Number of New Defendants | _____ | |
| Total number of counts | _____ | |

**Court Division:** (Select One)

| | | |
|---|---|---|
| __X__ Miami | _____ Key West | |
| _____ FTL | _____ WPB | _____ FTP |

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:        (Yes or No)        _YES____
    List language and/or dialect        SPANISH_____

4.  This case will take _3_ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                                (Check only one)

| | | | | |
|---|---|---|---|---|
| I | 0 to 5 days | __X__ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | _____ |
| II | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | __X__ |
| V: | 61 days and over | _____ | | |

6.  Has this case been previously filed in this District Court?   (Yes or No)        _No__
    If yes:
    Judge: _____   Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?        (Yes or No)        _____
    If yes:
    Magistrate Case No. _____
    Related Miscellaneous numbers: _____
    Defendant(s) in federal custody as of _____
    Defendant(s) in state custody as of _____
    Rule 20 from the _____        District of _____

    Is this a potential death penalty case? (Yes or No)        _No__

7.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?        _____ Yes        _X_ No

8.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?        _____ Yes        _X_ No

_____
ROBERT T. WATSON
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 679429

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **IGOR ITURRIAGA**

**Case No:** _____

Count #: 1

Conspiracy to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:**   Five (5) years' imprisonment

Count #: 5

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty:**   Twenty (20) years' imprisonment

Counts #: 8-12 and 14

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\*Max. Penalty:**   Twenty (20) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:** <u>OVIDIO ITURRIAGA</u>

**Case No:**

Count #: 1

Conspiracy to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**:   Five (5) years' imprisonment

Count #: 5

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty**:   Twenty (20) years' imprisonment

Counts #: 8-12 and 14

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\*Max. Penalty**:   Twenty (20) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **ESTHER LOPEZ**

Case No: _____

Count #: 1

Conspiracy to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:**   Five (5) years' imprisonment

Counts #: 2-4

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max. Penalty:**   Five (5) years' imprisonment as to each count

Count #: 5

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty:**   Twenty (20) years' imprisonment

Counts #: 6-7, 13 and 15-16

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\*Max. Penalty:**   Twenty (20) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**